## D. A. TOMPKINS CO. v. MONTICELLO COTTON OIL CO.

(Circuit Court, W. D. Georgia, S. D. May 16, 1907.)

1. DAMAGES—BREACH OF CONTRACT—COMPENSATION — CONTEMPLATION OF PARTIES.

In an action for breach of contract, the party committing the breach is liable only for such losses as would naturally and probably be in the contemplation of the parties at the time of making the contract.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Damages, § 58.]

2. SALES—BREACH OF CONTRACT—DAMAGES—CONTINGENT PROFITS.

Where defendant purchased certain cotton-seed milling machinery of plaintiff, to be installed at a specified time, and in contemplation thereof purchased large quantities of cotton seed, which deteriorated in value by reason of plaintiff's delay in installing the machinery, defendant was not entitled to recover on a counterclaim losses resulting from the manufacture and sale of the seed products which might not have occurred if the machinery had been installed in time.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, § 1198; vol. 15, Damages, §§ 72–88.]

3. DAMAGES—REDUCTION OF DAMAGES.

Where plaintiff contracted to install certain cotton-seed machinery in defendant's factory within a specified time, and foreseeing that it would be unable to deliver the machinery in time, notified defendant, urging him not to accumulate seed, it was defendant's duty to reduce its damages to a minimum, and it was not justified in purchasing such improvident quantities of seed that it·was necessary to store same on the ground, exposed to the elements, and charge the damage to plaintiff.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Damages, §§ 128–131.]

4. SALES—BREACH OF CONTRACT—DAMAGES—SUBSEQUENT CONTRACT.

Where defendant made certain contracts for the sale of cotton-seed products, after the execution of plaintiff's contract to install certain machinery in defendant's factory at a specified time, plaintiff was not chargeable with defendant's losses on such contracts because of plaintiff's failure to install the machinery within the time.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, § 1198; vol. 15, Damages, §§ 72–88.]

5. SAME—MEASURE OF DAMAGES.

Where plaintiff failed to perform a contract to install certain cotton-seed machinery in defendant's factory within a specified time, and defendant purchased cotton seed in large quantities, relying on the performance of the contract, the measure of defendant's damages was the difference between the value of the seed at the time the machinery should have been ready and when it was actually installed.

6. SAME—CONTRACT—BREACH—DELAY—RECOUPMENT.

Where defendant suffered damage because of plaintiff's delay in performing contract to install certain cotton-seed machinery in defendant's mill within a specified time, but there was no proof as to the difference in value of defendant's cotton seed at the time the machinery should have been installed and when it was actually ready, defendant was only entitled to recoup against the purchase price the necessary expense incurred in stirring and airing the seed during the delay, the cost of insurance necessitated thereby, the loss in value of seed damaged by the delay and sold for fertilizer, and the expense of replacing a shaft broken on account of improper adjustment by plaintiff's servants.

In Equity.

See 137 Fed. 625.

Merrill P. Callaway and Eugene Black, for complainant.
John R. L. Smith, for defendant.

SPEER, District Judge. The complainant, the D. A. Tompkins Company, entered into a contract to furnish the machinery for the mill of the defendant, the Monticello Cotton Oil Company. It was expressly agreed that the machinery should be installed by September 15, 1902. The defendant was about to engage in what to it was a new enterprise, namely, the manufacture of the products of cotton seed. Because it was necessary to buy seed for the purpose of manufacture at the time when the gathering of the cotton crop made such seed available, the date of installation of the machinery was an essential part of the contract. The machinery, however, was not placed in position until the 8th day of December, nearly three months after that date. The controversy followed.

The complainant, having been paid in part for the machinery, insists that it should recover the full balance of the contract price. This, it is alleged, is $10,010.87. Added to this is an item for extra machinery, making a total of $10,306.66. The defendant resists this claim, and seeks by an answer, setting forth what may be termed a demand for recoupment, to reduce the complainant's demand by alleged damages resulting from the delay, amounting to $8,313.11. This claim for damages, is, in the main, based on alleged losses from the heating of cotton seed, which the defendant had purchased in anticipation of its manufacture into its several products. The controversy has been presented at several times, and on a previous hearing the court found that "appreciable" and "considerable loss" had resulted to the defendant. This was expressed as follows:

"Finding the defense in part at least meritorious, the court feels obliged to disallow the claim for attorney's fees, traveling expenses, and other fees connected with collection. Nothing then remains to be done save to ascertain by how much the complainant's demand shall be reduced because of the failure on its part to complete the contract by the time and in the manner it engaged to do. This task will be referred to a master, with direction to compute such damages."

A reference was accordingly made. After considering all of the evidence, the master, W. F. Grace, Esq., in a very clear and valuable report, makes alternative findings of fact to depend for adoption by the court upon the true rule 'of ascertainment or measure of damages. There being no doubt as to the breach of contract, the master first finds that, if the damages are to be estimated on the difference between the value of the cotton seed of the defendant company at the time the machinery should have been installed and its depreciated value when the installation was effected, the damages sustained by the defendant were $995.97. The alternative finding is that, if damages are to be estimated in view of subsequent losses alleged to have been sustained by the defendant company from the manufacture and sale of the mill products, the claim of the plaintiff should be reduced in the sum of $6,428.71. The finding of the court must depend upon what seem the proper rule of estimating damages resulting from the breach of a contract of this character.

Now, the object of damages is compensation, and it is a general rule that the party committing the breach is liable only for such losses as would naturally and probably be in the contemplation of the parties at the time of making the contract. In other words, the parties will not be held liable for contingent damages which they could not anticipate as reasonably and probably resulting for the breach at the time they made the contract, after weighing its facts and conditions. The rule established by section 3798 of the Code of Georgia of 1895, which is but a statement of the general law, is as follows:

"Remote or consequential damages are not allowed whenever they cannot be traced solely to the breach of the contract, or unless they are capable of exact computation, such as are the profits which are the immediate fruit of the contract, and are independent of any collateral enterprise entered into in contemplation of the contract."

This rule is not gathered from any special state enactment on the subject, but was placed in the Code by the profound lawyers who made the codification of 1861. It has remained unchanged by the numerous revisions since then. Indeed, it is stated in the case of Willingham v. Hooven, 74 Ga. 234, 58 Am. Rep. 435, that the rule was condensed by the first codifiers, from the following early decisions of the Supreme Court of Georgia: Coweta Falls Mfg. Co. v. Rogers, 19 Ga. 417, 65 Am. Dec. 602; Cooper v. Young, 22 Ga. 269, 68 Am. Dec. 502; Red v. City of Augusta, 25 Ga. 386.

Now, the defendant's claim is based upon its theory of the amount of prime oil, prime cotton-seed meal, and prime hulls which woud have been produced by the 2,876 tons of cotton seed, purchased by it, had the machinery been installed in time, and upon the further theory that these products would have brought the highest prices existing at the date of sale, or at such times as the defendant might have chosen to put such products upon the market. It is vital to the rights of the parties to inquire: Would not this contention embrace contingent profits, involving the character of the seed, the skill in handling and manufacture, the business sagacity of the defendant's management, the activity of its agents or salesmen, the excellence of its product, and other contingencies, about which the manufacturers of machinery could have had no information whatever when the contract was made. In reply to this inquiry, the defendant would rely on the case of Van Winkle v. Wilkins, 81 Ga. 93, 7 S. E. 644, 12 Am. St. Rep. 299. The case related to cotton-seed oil machinery, involved a breach caused by dely, and is generally similar to the case at bar; but the conclusion of the court on the measure of damages is inimical to the defendant's contention, and is as follows:

"If the loss be on cotton seed which are deteriorated by keeping, the difference in value," the court declares, "in the seed as they were when the machinery ought to have been ready and as they were when it was actually ready for their manufacture is the measure."

No weight is accorded in that case to the contention that the resulting profits or losses from the operation of the mill, after the manufacturer who made its machinery had lost all connection with it, should enter into the calculation of damages. This rule expressed by the Supreme Court of Georgia seems entirely just. Let us place ourselves

for a moment in the attitude of the contracting parties when the written contract for purchase and sale was signed. The Tompkins Company knew that time was of the essence of the contract; that the 15th of September was the date when abundant quantities of cotton seed could be obtained and in the locality where the material was to be placed. It knew that to accumulate the seed at about that time was indispensable, that unreasonable delay would cause deterioration in its value; but it did not and could not know whether the newly organized company would make prime meal, oil, or hulls. It could not know the skill of its operatives, the sagacity of its business management, its attentiveness to business, or the market prices of the cotton-seed products. The Monticello Company knew as much, and no more. How can it be reasonably urged, then, that the losses resulting from the manufacture and sale of the seed products could have entered into the contemplation of the contracting parties. It is true that the rule contended for by the defendant has been ingeniously presented, and has the element and interest of novelty. It is, however, in our judgment supported neither by sound reason nor convincing authority.

In the case of the Ship Sabioncello, Fed. Cas. No. 12,199, where the cargo had been damaged by bad storage, it was held:

"That the amount of damages was properly arrived at by ascertaining the difference between the market value of the goods in their damaged state and what would have been their market value if they had been sound."

The cargo consisted of rags intended for the manufacture of paper. The rags had been injured by oil. The owner of the goods was a paper manufacturer, and, when the damaged goods were sold at auction, he bought them in, and manufactured them into paper, and sold the paper at the same price of that made from undamaged stock. This, however, did not change the rule. It follows, then, that the skill or want of skill, the success or want of success, of the manufacturer in making up the material, or in disposing of its product, can have no legal relation to the measure of damages resulting from a failure to deliver in time the machinery with which the manufacture is done.

Among the specification of damages alleged by the defendant are losses upon two subsequent contracts, on account of inferior oil, and losses upon tanks of oil, sold at various times, and as late as six months after the completion of the mill. This inferiority is ascribed to the heating of the seed. The sales of the oil in tanks were generally made upon samples; but, if the measure of damages for which the defendant contends should be adopted, the evidence relating to that season would not show loss by the company. It appears that, at the time of the completion of the mill, the market price of prime oil was 28 cents a gallon. The price then advanced as high as 36½ cents, and the defendant company now seeks to hold the complainant liable for all differences between the amounts realized from certain sales and the highest market value at the time; but, on this contention, if it should be considered at all, the complainant has the right to insist that the profits for the entire season should be considered. When this is done, it is seen that, owing to the rapid increase in the market value of oil, the defendant made large profits. It actually made sales as high as

35½ cents a gallon, a profit of 7½ cents above the cost of oil per gallon at the time the contract was broken. But, if it were otherwise, the Tompkins Company could not be held responsible for fluctuations in market value, or differences in sales, long after the completion of their contract. To recover profits, they must have been in the contemplation of the parties at the time the contract was made. 13 Cyc. 36. The case of Pennypacker v. Jones, 106 Pa. 242, was not unlike the case at bar. There the defendants engaged to place in the plaintiff's mill machinery of a certain capacity to produce a high grade of flour. The machines proved incapable of meeting the requirements, and the court held that the loss of possible profits was not a proper subject of damages. The language is as follows:

"It was no part of this contract that the plaintiff should make profits, or even have the opportunity of doing so by carrying on a business with the machinery which the defendants agreed to erect. It is not like the sale of chattels or of land, where the difference between the contract value and the actual or market value of the property sold represents directly and immediately the measure of the party's loss or gain in the transaction. There the possible profit is the very object of the contract, and is necessarily in the contemplation of the parties; but, when a machinist furnishes machinery to a mill owner, it is no part of his engagements that a profitable business shall be carried on with the machinery furnished. Of course, if it is defective, he is responsible for the damage resulting directly from such defect."

This language is quoted with approval by the Supreme Court in Howard v. Stillwell & Bierce Mfg. Co., 139 U. S. 208, 11 Sup. Ct. 500, 35 L. Ed. 147. That was a case where anticipated profits, which were lost by delay in installing machinery for a wheat mill, were sought to be recovered. The recovery was denied, and said Justice Lamar, for the court:

"There was no stipulation in the contract that the defendant should make profits on flour from the wheat ground up by the machinery which the plaintiff contracted to furnish and erect in the mill. Nor were there any special circumstances attending the transaction from which an understanding between the parties could be inferred that the plaintiff was to make good any loss of profits incurred by a delay in furnishing and putting up such machinery according to the terms of the contract."

In Freeman v. Clute, 3 Barb. (N. Y.) 427, the court observed:

"I cannot agree with the counsel for the plaintiff that the estimated profits upon the manufacture of a specified quantity of flax seed into linseed oil constitutes a legitimate item of damages against the defendant. Such profits are entirely too speculative and uncertain to make them the measure of damages."

It is further true that the law requires the injured party to use all reasonable means to reduce his damages to a minimum. Warren v. Stoddart, 105 U. S. 229, 26 L. Ed. 1117. The Tompkins Company in the progress of the work foresaw that it would not be able to deliver the machinery on time. It wrote to the defendant, urging it not to accumulate seed. The oil company, however, not only continued to buy seed, but purchased in such improvident quantities that it became necessary to place a considerable part of it on the ground without cover, and exposed to the injurious action of the rain and storms which are prevalent at that season. This is mentioned as illustrative

of the dangers to justice, of contingent demands if we depart from the settled and well-ascertained measure of damages.

The defendant, besides, claims damages upon special contracts, made with the American Cotton Oil Company, and with the McCaw Manufacturing Company. The first was made on September 4, and the latter on September 22 and 27, 1902. These were entered into after the original contract, and, in the case of the McCaw Company, after its breach. The Tompkins Company, of course, could not have foreseen these contracts, and is not chargeable with losses resulting therefrom. In Sanderlin v. Willis, 94 Ga. 171, 21 S. E. 291, it was held that a grantee could not recover profits which he would have made on a contract of sale with a third person, unless the grantor had notice of such contract when he made the bond for titles. The same principle was announced in Stewart v. Lanier House Co., 75 Ga. 582. There the lessee of a hotel sought damages against the lessor for the loss of a contract of subleasing. The damages, however, were denied by the court, on the ground that the parties could not have reasonably contemplated the sublease or its loss when they made the contract. See, also, Abbott v. Gatch, 13 Md. 314, 71 Am. Dec. 635; Williams v. Wood, 55 Minn. 323, 56 N. W. 1066.

The same considerations would apply to the claim for damages based upon the output of inferior meal and hulls. Nor is the claim for damages, resulting from a deficient output for the entire season, based in any sense upon the true measure, or upon sufficient evidence. Indeed, it appears from the testimony of the defendant's witnesses that there was not more than 10 per cent. of prime oil made that season by any of the mills. The proper measure of damages, as we have stated, is not the market value of the manufactured products sold months after the breach of the contract, but the difference between the value of the seed at the time the machinery should have been ready, and when it was actually installed. The defendant company has introduced no evidence as to such values. The proof is silent as to the quantity of seed heated, and as to the extent of its consequent depreciation in market value. Nor is it sufficiently made to appear whether the seed was heated before or after the breach of the contract. Indeed, much of the damage may have ensued because the defendant crowded the seed into small houses, and again left it unprotected upon the ground. There is such a multiplicity of uncertain and speculative elements involved in the contention of the defendant that the impropriety of the rule invoked by it is obvious. But there is the great salient indisputable fact that the complainant constructed and furnished machinery of the highest class for a modern cotton oil mill, for which the defendant has paid little more than one-half of the purchase price it expressly agreed to pay. There is nothing speculative or contingent about that.

In view of these considerations, the court is unable to approve the large claim for damages presented by the defendant. The losses which are ascertainable as a result of the breach are in our judgment correctly computed by the master. As the defendant has proved no definite damages as to the seed, its claims for problematical losses in value will be denied. The other items which will be allowed are

found as follows: Reasonable necessary expense incurred in proper efforts to lessen the damage by stirring and airing the seed, pending the delay in the completion of the mill, $200; insurance on the seed, necessitated by the delay, $250; necessary expense incurred in replacing a certain shaft broken on account of improper adjustment by the complainant's agents, $135.97; loss in value on 61 tons of the damaged seed, sold and only fit for fertilizer purposes, $410. These claims amount to $995.97.

The rule we have adopted on the measure of damages, and the finding of the amount for which each of the parties are held properly ·liable, is not only deducible from the master's report, but, after repeated hearings upon every issue involved, is attained by the independent investigation made by the court of the law and the facts.

A decree will be accordingly rendered for the complainant against the defendant for the sum of $9,310.69, with interest from December 8, 1902—in the aggregate $12,868.15. At that date, the machinery had been installed, and the mill was turned over and received by the defendant. The decree will also provide that the costs and expenses shall be ascertained, and that each party shall pay a share thereof ratably proportioned to the amount for which it is adjudged liable.